1:23 MJ 4265

# AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

I, Orlando Almonte, Task Force Officer (TFO) with the Drug Enforcement Administration (DEA), Cleveland, Ohio, hereinafter referred to as "Affiant", being duly sworn, depose and state as follows:

## INTRODUCTION

1. Affiant is currently employed as a Detective with the City of Euclid (Ohio) Police Department and he been so since March 2008. Affiant has been assigned to the DEA Cleveland District Office (CDO) since July 2018 as a TFO.

2. Consequently, Affiant is an "Investigative or Law Enforcement Officer" of the United States under 18 U.S.C. § 2510(7), and is empowered by law to conduct investigations and to make arrests for offenses enumerated in 18 U.S.C. § 2516. Affiant is also a "Federal law enforcement officer" under Federal Rule of Criminal Procedure 41(a)(2)(C).

3. In Affiant's current assignment to the CDO, Affiant has participated in investigations targeting individuals and organizations committing drug trafficking offenses in the Northern District of Ohio and elsewhere. At all times during the investigation described herein, Affiant has been acting in an official capacity as a TFO with the DEA.

## TRAINING AND EXPERIENCE

4. I am a Narcotics Detective of the Euclid Police Department, currently assigned as a Task Force Officer with the Drug Enforcement Administration. I have been with the Euclid Police Department since March 2008. I am currently assigned to the Drug Enforcement Administration (DEA) Task Force – Cleveland District Office. My training and experience includes twenty (20) years of experience as a police officer; six and one-half years with the Manatee County Sheriff's Office in Florida, one year and one-half year with the Lorain County Sheriff's Office in Ohio,

and twelve years of experience as a police officer with the City of Euclid. The affiant has been assigned as a detective in the Euclid Police Department Narcotics Unit for 6 years.  The affiant has participated in courses and received training in the detection, recognition, packaging, and selling of controlled substances and dangerous drugs, training in investigative techniques through course work at the Ohio Peace Officer Training Academy, the DEA drug investigator's school and involvement in numerous narcotics investigations as a member of the Euclid Police Department.

5.   Affiant's experience as a Narcotics Detective and TFO includes, but is not limited to: physical and electronic surveillance, participating in Title III wiretap investigations, analyzing pen register and telephone toll data, interviewing witnesses, drafting and executing search warrants seeking evidence of drug violations, processing seized evidence, supervising the purchase of controlled substances by confidential sources, and debriefing persons arrested and convicted of drug trafficking offenses regarding their illegal activity.

6.   From my participation in these investigations, Affiant has become familiar with the patterns of activity of drug traffickers, the types and amounts of profits made by drug dealers, and the methods, language, and terms that are used to disguise the source and nature of the profits from their illegal drug dealings.  Based upon Affiant's training and experience, interviews conducted with defendants, informants, and other witnesses to, or participants in, drug trafficking and money laundering activity, Affiant is familiar with the ways in which drug traffickers and money launderers conduct their business, including the various means and methods by which drug traffickers import and distribute drugs, and the ways that drug traffickers and money launderers use cellular telephones, digital display paging devices, and calling cards to facilitate their activity.  Drug traffickers and money launderers also use numerical codes and code words

to conduct their transactions.  In Affiant's experience, drug traffickers and money launderers often obtain cellular telephones in fictitious names and/or the names of third parties in an effort to conceal their activities from law enforcement.  Affiant is also familiar with the ways in which drug traffickers conceal, convert, transmit, and transport their drug proceeds, including, but not limited to, the use of couriers to transport currency and proceeds, the use of third parties and nominees to purchase or to hold title to assets, and the use of off shore accounts.

7.  Affiant has participated in numerous drug-related investigations involving the following types of drugs: heroin, cocaine and cocaine base, methamphetamine and crystal methamphetamine, fentanyl and fentanyl analogues, and marijuana.

8.  Affiant knows that persons engaged in drug activity require expedient forms of communication to maintain an adequate and consistent supply of drugs from sources, and to effectively market those drugs to customers.  Continued access to cellular telephones (traditional and pre-paid) is crucial to the success of drug traffickers.  Further, Affiant knows that wholesale narcotics distributors will frequently use more than one source of supply in order to obtain the lowest price and/or maintain a steady supply of narcotics.  Professional drug distributors often provide drugs to associates on credit and receive payment once the drugs are sold, a practice known as "fronting."

9.  Based upon Affiant's training and experience, Affiant knows that drugs are generally stored and dispersed at varied, and highly secret locations to avoid seizure and theft.  Payment for drugs usually occurs at quickly arranged meetings and at various locations separate from those used to store the drugs.  Telephonic contact is therefore required to coordinate and conduct the ongoing illegal narcotics transactions.

## PROBABLE CAUSE

10. This affidavit is being submitted for the limited purpose of establishing probable cause that Aaron LOINES has violated 21 U.S.C. § 841 (a)(1) and (b)(1)(C), distribution of fentanyl. This affidavit does not include every fact known to me regarding this investigation but will seek to summarize relevant information.

## OVERVIEW OF CASE INITIATION

11. Since August 2023, Agents from the DEA Cleveland District Office initiated an investigation into the drug trafficking activities of Zaire WRIGHT. To date, the investigation has included, but is not limited to:

   a. Information provided by confidential sources;

   b. Several controlled purchases of methamphetamine, fentanyl, and fentanyl pills;

   c. Information provided by local law enforcement and drug task forces;

   d. Physical surveillance; and

   e. Remote electronic surveillance.

## BACKGROUND INFORMATION

12. The United States, including the Drug Enforcement Administration (DEA), has been conducting a criminal investigation of Zaire WRIGHT and members of his drug trafficking organization (DTO) regarding possible violations of Title 21, U.S. Code, Sections 841(a)(1), 843(b) and 846.

13. In August 2023, Narcotics Special Agent Tim Novak of the Lake County Narcotics Agency (LCNA) contacted your affiant requesting assistance from the DEA- Cleveland District Office to investigate the drug trafficking activities of Zaire WRIGHT. It should be noted that at the time WRIGHT's identity was initially unknown to investigators. It should also be known that

in a separate affidavit written and sworn to by Special Agent Abdallah Atyani, WRIGHT was referred to as "FNU LNU". However, through investigative means as (detailed throughout this affidavit) investigators were able to determine that "FNU LNU" was in fact WRIGHT. For the purposes of clarity in this affidavit, your affiant will refer to WRIGHT as the initial target of this investigation.

14. According to Agent Novak, he developed a confidential source, (hereinafter referred to as **CS#1**), during a separate narcotics investigation who wanted to cooperate with law enforcement for consideration on pending charges. As detailed herein, Agent Novak was able to corroborate the information provided by the CS#1 in this investigation and past investigations, and has found the information from the CS#1 to be reliable.

15. According to Agent Novak, CS#1 provided information about WRIGHT being an ounce level methamphetamine and fentanyl dealer utilizing the phone number, **216-778-0553**, (hereafter referred to as **TT-1**) operating in the Northeast Ohio area.

16. CS#1 admitted to having purchased methamphetamine from WRIGHT in the past. CS#1 stated that he/she did not know the name of the person utilizing (**TT-1**), but described WRIGHT as a black male, approximately 250 pounds, 5'10" and has short hair. Additionally, CS#1 admitted to contacting WRIGHT at **(TT-1)**, in order to purchase ounces methamphetamine in the past. CS#1 stated that WRIGHT was often in possession and capable of selling ounces to pounds of methamphetamine and ounces of fentanyl.

17. Investigators initially attempted to identify WRIGHT by researching law enforcement databases. Investigators found that in ("JPay")[1], **TT-1** was found belonging to an individual by

---

[1] A web-based application utilized by the incarcerated population confined in a local jail, state and/or federal prison to communicate electronically with individuals in the community providing services such as money transfers, email and video visitation between inmates and their friends/family.

the name of Zaire WRIGHT (DOB XX/XX/1998) with a documented address of as 1XXXX Saywell Avenue, Cleveland, OH 44108, and an email of zaire0322@gmail.com.

18. Further research revealed that WRIGHT had a criminal history that included arrests for: criminal trespassing, obstructing justice, harassing communication, burglary, attempted burglary, probation violation, theft, domestic violence, endangering children resisting arrest and aggravated menacing.

19. Investigators then reviewed WRIGHT's Ohio BMV records which revealed that the same address documented in "JPay" was the same address listed on WRIGHT's driver's license. Investigators then showed the driver's license photo, which was dated March 2022, to CS#1. CS#1 was not completely positive on whether WRIGHT was the person he/she was in contact with due to the different hair style.

## CONTROLLED PURCHASE FROM WRIGHT UTILIZING CS#1

20. On August 25, 2023, members of the DEA and LCNA conducted a controlled purchase of one pound of methamphetamine, utilizing CS#1, from a male drug dealer that investigators later identified as WRIGHT. The details of the controlled purchase are below.

21. On the same date, investigators instructed CS#1 to communicate with WRIGHT at **TT-1** to coordinate with each other the details of the purchase for the one pound of methamphetamine. During an exchange of text messages between CS#1 and WRIGHT who utilized **TT-1**, both parties agreed to meet at 14806 Alder Avenue, Cleveland, Ohio. These messages were later shared by CS#1 to investigators to confirm the exchange between CS#1's phone and **TT-1**, utilized by WRIGHT. Prior to the controlled purchase taking place, CS#1 received and updated text from **TT-1**, utilized by WRIGHT who had changed the meet location from 14806 Alder Avenue to 14310 Alder avenue, Cleveland, Ohio. Investigators believe that

the change of address was sent to CS#1 in order to potentially deter law enforcement from the 14806 Alder Avenue.

22. During the controlled purchase, a recorded phone call monitored by investigators was made by CS#1 to **TT-1**. During the recorded conversation, CS#1 and WRIGHT agreed to meet to complete the drug transaction.

23. Prior to the controlled purchase, CS#1 and his/her car were searched for contraband, both yielding a negative result. Investigators also provided CS#1 with covert audio and recording devices to capture audio and recording of the drug transaction.[2] CS#1 was provided with the pre-recorded funds to purchase the one pound of methamphetamine.

24. Once surveillance units were set up at the buy location, CS#1 was followed directly by investigators to the buy location. Upon arriving, surveillance units who were set up on Alder Avenue observed a black male wearing a hoodie and black sweat pants (who was later determine to be WRIGHT) exited as the passenger side of a gold colored Ford Fusion bearing license KAGXXXX. WRIGHT then walked to the CS' vehicle and entered via the passenger side and met with CS#1. During their interaction, CS#1 exchanged the funds with WRIGHT for the one pound of methamphetamine. Once the transaction was done, WRIGHT exited the CS' vehicle and walked back to the gold Ford Fusion.

25. After the controlled purchase was conducted, CS#1 was followed by investigators back to the pre-determined location to turn over the purchased the methamphetamine to law enforcement. There, CS#1 turned over the purchased methamphetamine to investigators. CS#1 was then thoroughly searched, yielding a negative result. The CS's car was thoroughly searched

---

[2] The video recording malfunctioned on one device, the audio and visual on the other device functioned properly. Due to the placement of the functioning device, in the CS's pocket, the video does not provide any visual of the narcotics deal and only provided audio.

as well, yielding a negative result. The methamphetamine was then field tested utilizing a methamphetamine drug test kit, which yielded a positive result for methamphetamine. A DEA analysis report later confirmed that the substance was in fact methamphetamine, with a purity of 96%[3] weighing 446.8 gram (N/W).

26. While debriefing CS#1, investigators utilized Ohio Bureau of Motor Vehicle (BMV) records in order to obtain information about the owner of the Ford Fusion bearing license KAGXXXX. BMV records identified the owner as D.M.[4] A picture of D.M. was later shown to CS#1, who was not able to identify the owner as being the male who sold the methamphetamine or someone CS#1 knew as someone acting in concert with WRIGHT. At this point of the investigation, although investigators were able to determine that the male who sold the methamphetamine to CS#1 resembled WRIGHT's description, investigators on this date had not identified the true identity of the male who sold the methamphetamine. Additionally, investigators were unable to identify the male driver of the Ford Fusion as D.M..

## INFORMATION REGARDING CS#1

27. On August 29, 2023, DEA Investigators received information from a local law enforcement agency related to CS#1. The information was received by an anonymous caller, who claimed to have recently visited CS#1 at his/her residence. According to the anonymous caller, during the visit, CS#1 was allegedly seen in possession of what the caller believed to be "pounds" of methamphetamine.

28. On September 1, 2023, SA Atiyani and your affiant traveled to the CS' residence to meet with CS#1 in order confirm or dispel the information previously mentioned by the local law

---

[3] As per DEA lab report 2023-SFL5-06389.
[4] D.M.'s identity is known to your Affiant, but not included herein, as D.M. is not the subject of this complaint.

enforcement agency, particularly to ensure that CS#1 was not engaged in illegal drug conduct while acting as a Confidential Source. During the visit to CS#1's house, SA Atiyani and your affiant spoke with CS#1 regarding the information / accusation that was mentioned by the local law enforcement agency from the anonymous caller. CS#1 understood the accusation, but denied having any possession of any narcotics. As a result, CS#1 consented to a search of the his/her residence for any narcotics or weapons. Investigators then searched the residence and found no evidence to support the anonymous caller's information of narcotics use, possession or storage. Therefore, there was no reason to believe that the CS' reliability had been compromised.

29. Due to this ongoing investigation, investigators decided to limit the use and exposure of CS#1 as it pertains to WRIGHT's drug trafficking activities based on the allegation.

## UNDERCOVER (UC) INTRODUCTION TO WRIGHT

30. On September 5, 2023, SA Atiyani and your affiant instructed CS#1 to contact WRIGHT and introduce Alcohol, Tobacco, Firearms and Explosives (ATF) Task Force Officer Donald Kopchak, acting in an undercover (UC) capacity (hereinafter referred to as UC#1). CS#1 then made a recorded call to **TT-1**, a phone utilized by WRIGHT.

31. During that recorded call, CS#1 successfully introduced UC#1 to WRIGHT under the premise that UC#1 would purchase narcotics directly from WRIGHT. Shortly after the recorded call, UC#1 placed a recorded call to **TT-1** and spoke to WRIGHT.

32. During that recorded phone call, UC#1 and WRIGHT spoke about amounts and prices for a future narcotics deal. More specifically, during that conversation WRIGHT quoted UC#1 the price of *"six hundred ($600.00)"* an ounce *"zip"* for fentanyl he claimed to be *"raw"* product. During the call, UC#1 then mentioned to WRIGHT that he was looking for *"skates"*, aka methamphetamine. At that point, WRIGHT engaged in the conversation claiming that the

supply for methamphetamine was scarce due to recent law enforcement bust / raid of a source of supply who supplied local drug traffickers. WRIGHT claimed that the source of supply was the motorcycle gang known as the *"Hells Angels"*. WRIGHT added that during that bust / raid, law enforcement seized *"pounds"* of *"ice"* (aka methamphetamine), and arrested several members of the *"Hells Angels"*. UC#1 then told WRIGHT that due to the low supply of methamphetamine, prices for an ounce of methamphetamine were up to *"five hundred ($500.00)"* in the Medina, Ohio area. WRIGHT then admitted to UC#1, that he knew of customers from Medina, Ohio who were travelling to Cleveland, Ohio to purchase methamphetamine for the price of *"one hundred ($100.00) a gram"* from his (WRIGHT's) *"uncle"* who was making *"twenty-eight hundred ($2,800.00) a zip (ounce)"*. Towards the end of the conversation, WRIGHT introduced himself to UC#1 as "MONEY".

33. Based on the conversation between WRIGHT and UC#1, your affiant believes that WRIGHT is able to provide UC#1 with pure / uncut fentanyl, *"raw"* at the price of $600.00 an ounce, *"zip"*. WRIGHT portrayed himself as no stranger to the selling, the supply, and the demand of methamphetamine. WRIGHT also stated that was well aware of recent law enforcement activity and seizures of methamphetamine involving a local source of supply, known as the *"Hells Angels"*, which suggested he had knowledge of law enforcement investigations in the area. Additionally, WRIGHT implicated that a family member *("uncle")* was also a drug trafficker and selling methamphetamine at a high price due to the limited supply, (*"$100.00) a gram"; "$2,800.00 an ounce"*). Based on this information, your affiant believes that it is likely that WRIGHT is being supplied with large amounts of methamphetamine by a family member possibly his actual *"uncle"* or someone WRIGHT refers to as an *"uncle"*. At this point of the investigation, WRIGHT's *"uncle"* has yet to be identified. As noted above, before

the conversation ended WRIGHT told UC#1 to refer to him as "MONEY". Your affiant believes that this is the street / dealer name WRIGHT is currently utilizing.

## INFORMATION REGARDING TT-1

34.    On August 28, 2023, investigators received the account information from the service provider of **TT-1** in response to an administrative subpoena. According to their records **TT-1** was subscribed to UNKNOWN UNKNOWN since January 8, 2023. The billing address on the account was listed as 123 UNKNOWN UNKNOWN, Cleveland, Ohio.  It should be noted that At the time of the investigation, investigators had not yet to fully identified the person utilizing **TT-1** to conduct drug trafficking activities in Northeast Ohio. However, as detailed below it was later determined that WRIGHT was the user of **TT-1**.

## CONTROLLED PURCHASE UTILIZNG ATF UC FROM WRIGHT

35.    On September 7, 2023, WRIGHT utilizing **TT-1** contacted ATF TFO Don Kopchak who was acting in an undercover capacity (hereinafter referred to as UC#1) via a recorded phone call to coordinate with UC#1 about the details of the purchase of the fentanyl deal. Both WRIGHT and UC#1 agreed to meet on September 8, 2023 to conduct the drug transaction.

36.    On September 8, 2023, members of the DEA and ATF conducted a controlled purchase of one ounce of fentanyl, utilizing UC#1. The details of the controlled purchase are below. On the same date, UC#1 attempted to contact WRIGHT at **TT-1** via a recorded phone call in order to confirm their meeting for the fentanyl deal. WRIGHT did not answer the attempted recorded calls by UC#1. Shortly after, WRIGHT contacted the UC from **TT-1** and instructed UC#1 to meet at a different location in Euclid, Ohio.

37.    Prior to the controlled purchase, investigators provided UC#1 with the confidential funds to purchase the fentanyl. UC#1 was also equipped with covert audio and recording devices

to capture audio and recording of the drug transaction. For this operation, ATF Special Agent Brian Middaugh was assigned to accompany TFO Kopchak, as a second undercover agent (hereinafter SA Middaugh is referred to as UC#2). For the operation, UC#1 and UC#2 were followed by investigators and kept under constant surveillance to ensure the safety of the UCs as they travelled to and from the controlled purchase. As the UCs were on their way to the buy location, UC#1 and WRIGHT again spoke on the phone and WRIGHT changed the meet location to 16404 Euclid Ave., Cleveland, Ohio.

38. Based on the events that occurred during the controlled purchase on August 25, 2023, surveillance units (to include your affiant) travelled to the area of 14800 / 14806 Alder Avenue, Cleveland, Ohio and established surveillance due to its close proximity to the buy location. While on surveillance at 14800 / 14806 Alder Avenue, Cleveland, Ohio, your affiant observed a black male, that matched WRIGHT's description exit through the front door of 14800 Alder Avenue, Cleveland, Ohio wearing a white shirt, multicolored pants and white shoes and enter into a silver Toyota Highlander SUV that was parked in the street directly in front of the residence. Shortly after, the same black male exited the Toyota Highlander and ran back to the residence and entered the residence through the front door. Within seconds, your affiant observed a black male, that matched WRIGHT's description again exited the residence through the front door and returned to the silver Toyota Highlander as if he was in a hurry. Shortly after, WRIGHT departed the residence driving the Toyota Highlander. Surveillance units noted that the vehicle had no visible license plate and a damaged driver side window.

39. Based on the observations made by your affiant, Investigators who were set up at the buy location were given the description of what WRIGHT was wearing and driving as it appeared that he was travelling towards the buy location.

### AUTHORIZATION FOR THE ELECTONIC SURVEILLANCE OF TT-1

40. On September 12, 2023, United States Magistrate Judge Thomas M. Parker granted SA Atiyani a warrant authorizing the electronic surveillance to monitor the location ("PING") of **TT-1**, in real time. The first coordinates were received by SA Atiyani on the same day and the first coordinates of the first ping are: latitude 41.521266, longitude -81.542190 and the location of this ping is 3837 Mayfield Rd., Cleveland Heights, Ohio 44121.

### SUMMARY OF THE INVESTIGATION
### BETWEEN SEPTEMBER 12, 2023 AND NOVEMBER 5, 2023

41. As detailed above investigators between August 2023 and September 12, 2023 have corroborated the information from CS#1 that WRIGHT is an ounce level methamphetamine and fentanyl dealer, utilizing **TT-1**, operating in the Northeast Ohio area. Investigators have also had CS#1 introduce an undercover agent to WRIGHT, who is posing as a potential customer looking to purchase narcotics from WRIGHT. Additionally, investigators were authorized to monitor the location of **TT-1**.

42. Between September 13, through November 2, 2023, investigators utilizing UC#1 have conducted a series of controlled purchases from WRIGHT and members of his DTO, Shondell JACKSON and J.M.[5] The controlled purchases have resulted a total seizure of approximately 1,646 grams of methamphetamine; approximately 195 grams of fentanyl; and 3,100 fentanyl pills.

### AUTHORIZATION FOR A TITLE III INVESTIGATION OF TT-1

43. On Tuesday, October 24, 2018, at approximately 11:37 AM, your affiant appeared before U.S. District Judge Patricia Gaughan for the purpose of securing a Title III authorization to intercept (216) 778-0553 (aka **TT-1**), used by Zaire WRIGHT.

---

[5] J.M.'s identity is known to your Affiant, but not included herein, as J.M. is not the subject of this complaint.

44. Pursuant to the Title III investigation of **TT-1**, as of October 24, 2023[6], investigators have intercepted one thousand eight hundred and fifty-two (1852) calls and four hundred and fifteen (415) texts. Those communications have corroborated that WRIGHT utilizes **TT-1** to further his drug trafficking activities in order to communicate with his customers and co-conspirators. Investigators have also intercepted communications between WRIGHT and what investigators believe that the individual who investigators have determined to likely be sources of supply for fentanyl pills utilizes 216-319-4076.

**CONTROLLED PURCHASE ON NOVEMBER 2, 2023**

45. Between October 29, 2023 and November 1, 2023, UC#1 was communicating with WRIGHT, at **TT-1**, to coordinate a purchase of approximately one (1) ounce of fentanyl powder, approximately one (1) pound of methamphetamine, and 2,000 fentanyl pills on November 2, 2023 from WRIHGT. The following timeline are details from the controlled purchase which involved WRIGHT, Shondell JACKSON and Aaron LOINES in the area of 15409 Grovewood Avenue, Cleveland, Ohio.

46. At approximately 10:14 am, UC#1 began to communicate with WRIGHT at **TT-1** via texts and calls. In summary, UC#1 and WRIGHT agree to go on with the transaction. At approximately 10:32 pm, utilizing GPS cell phone ping locations for **TT-1**, Your affiant noted that the GPS cell phone ping suggested that WRIGHT was travelling northeast (towards Cleveland), from Mayfield Heights.

47. At approximately 10:30 pm, SA Jonathon Fraser and your affiant met with undercover officers (UC's) UC#1 and ATF SA Brian Middaugh, hereafter referred to as "UC#2", at a

---

[6] On a previous affidavit which was signed November 1, 2023 for "PINGS" on 216-678-1059, your affiant mistakenly used the date of "October 28, 2023". The correct date was supposed to be October 24, 2023 as detailed above.

prearranged location. UC#1 was provided with a total of $7,650.00 in U.S. Currency[7] for the purchase.

48. At approximately 11:10 investigators intercepted a call made by WRIGHT utilizing **TT-1** to UC#1. During that call, WRIGHT instructed the UC to meet at the same Grovewood address they met at last (referring to 15409 Grovewood Ave., Cleveland, Ohio).

49. At approximately 11:20 am, the UC's departed the prearranged location and were followed to the agreed upon meet location by other members of the ATF.

50. At approximately 11:32 am, UC#1 texted WRIGHT at **TT-1**, that he had arrived. WRIGHT then responded "ok". At this time surveillance had been established in the area of 15409 Grovewood Ave., Cleveland, Ohio.

51. At approximately 11:33 am, surveillance units overserved LOINES black Chevrolet Malibu bearing Ohio license plates KDL7069 arrive at the same location and park in the driveway. The driver never exited the vehicle.

52. At approximately 11:37 am, surveillance units observed WRIGHT driving a Hyundai Tucson bearing Ohio license plate #JUJ6050[8], followed by Shondell JACKSON driving his Dodge Durango bearing Ohio license plate #JXW6831 as they both travelled east on Grovewood Ave. from Lakeshore Blvd. and park in front of 15409 Grovewood Ave., Cleveland, Ohio.

53. Between 11:37 am and 11:41 am, surveillance units observed the following during the incident:

> a. WRIGHT parked the Hyundai street behind the UC vehicle,
> b. WRIGHT then exited the Hyundai and walked to the front passenger side of the Durango, at which time he entered the front passenger seat of the vehicle;

---

[7] The funds were a combination of DEA, BCI and ATF Official Funds.
[8] A maroon 2019 Hyundai Tucson registered to a D.H. (a person known to your Affiant, but the name is not included here) at 3XXX Harvey Road, Cleveland, Ohio. Investigators have determined that D.H. is WRIGHT's other girlfriend.

    c. JACKSON parked then Dodge Durango in front of the UC vehicle;
    d. WRIGHT then exited the front passenger seat of the Durango and walk towards the UC vehicle;
    e. WRIGHT then entered the UC vehicle through the drivers' side rear passenger door.  (As detailed below, at this time WRIGHT handed over a gray shopping bag that contained the zip lock style bag with the pound of methamphetamine and then a sandwich style bag containing the ounce of fentanyl);
    f. Shortly after WRIGHT exited the UC vehicle and walked to the passenger window area of the Malibu, and made contact with the occupant(s) believed to be LOINES.
    g. WRIGHT then exited then walked away from the Chevrolet Malibu and back to the UC vehicle and re-entered. (As detailed below, at this time WRIGHT handed over a zip lock style bag containing the 2000 fentanyl pills to UC#2);
    h. WRIGHT then exited the UC vehicle and walk back to the Chevrolet Malibu, at which time he made contact with the occupant(s) again.

54. At this time, approximately 11:41 am, UC#1 and UC#2 leave the area as WRIGHT was with the occupant of the Chevrolet Malibu. At approximately 11:42 am, surveillance units observed WRIGHT walk back to the Hyundai and leave the area, followed by the JACKSON in the Durango. At 11:44 am, surveillance units then noted that the Chevrolet Malibu left the driveway of 15409 Grovewood Avenue and travel east on Grovewood. Surveillance units attempted to follow the Malibu as it left the area in a high rate of speed, but were unable to. At approximately 12:00 pm., surveillance units found the Malibu parked in at a gas station located at 15504 Waterloo Road, Cleveland, Ohio. Upon doing so, surveillance units positively identified Arron LOINES as the driver of the Chevrolet Malibu while he was standing at driver door of the vehicle while pumping gas. Shortly after, LOINES entered the Chevrolet Malibu and drove away.

55. During a debrief of the UCs, UC#1 and UC#2 corroborated the observations made by surveillance units of WRIGHT. UC#1 confirmed that WRIGHT had parked the Hyundai behind the UC vehicle. UC#1 then observed WRIGHT exit the Hyundai and enter the Durango as the

front seat passenger. JACKSON then parks the Durango in front of the UC vehicle at which point WRIGHT exited the Durango and walked to the UC vehicle. UC#1 can then see that WRIGHT appears to have the bag of methamphetamine and placed it in his hoodie pocket. WRIGHT then walked to the UC vehicle and entered the rear passenger compartment. Once inside the UC vehicle, WRIGHT retrieved a gray shopping bag that contained the bag of methamphetamine from the hoodie pocket and at the same time handed over a sandwich style bag of powder fentanyl from an unknown location on his person (UC#1 believed that it was likely in WRIGHT's pants pocket). WRIGHT then handed over both bags to the UCs and exited the vehicle. WRIGHT then says to the UCs that he had to go get "your stuff" (referring to the fentanyl pills) and exited the UC vehicle. UC#1 then observed WRIGHT jog over to the Chevrolet Malibu and conduct a hand to hand transaction with driver of vehicle via the passenger side window. WRIGHT then walked back to the UC vehicle and again enters the rear passenger compartment. Once inside, WRIGHT pulls out a bag containing the fentanyl pills out of his hoodie pocket. UC#2 then takes the bag pf pills and weighs it on a scale. Based on the weight, the UCs confront WRIGHT about the bag not containing 2000 pills. WRIGHT then made the statement of *"I ain't going to lie, my brother put it together for me"*. The UCs then hand over $7,400.00 in US Currency ($4,000.00 from UC#2 for the pills and $3,400 from UC#1) in exchange for all the drugs.

56. Your affiant later field tested the methamphetamine utilizing a methamphetamine drug test kit, which yielded a positive result for methamphetamine and weighed approximately 459 gross grams; the fentanyl powder utilizing a fentanyl drug test kit, which yielded a positive result for fentanyl and weighed approximately 35 gross grams; and the fentanyl pills utilizing a


fentanyl drug test kit, which yielded a positive result for fentanyl and weighed approximately 180 gross grams. A DEA analysis report is still pending.

## CONCLUSION

57. Based upon the listed facts and circumstances, your Affiant believes and asserts that there is probable cause that on the date of November 2, 2023, Aaron LOINES distributed methamphetamine in violation title 21 U.S.C. § 841 (a)(1) and (b)(1)(C).

_____
Orlando Almonte
Task Force Officer
Drug Enforcement Administration

Sworn to via telephone after submission by reliable electronic means pursuant to Crim. Rules 4.1; 41(d)(3), on this __13th__ day of November, 2023 at __12:16__ __P__.m.

_____
Jonathan D. Greenberg
United States Magistrate Judge

